# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 19-1355V

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * * * | |
| MARY JONES, | Special Master Katherine E. Oler |
| Petitioner, | |
| v. | Filed: August 15, 2023 |
| SECRETARY OF HEALTH AND HUMAN SERVICES, | |
| Respondent. | |
| * * * * * * * * * * * * * * * * * * * * * * * * * * | |

*Mark Sadaka*, Law Offices of Sadaka Associates, LLC, Englewood, NJ, for Petitioner
*James Lopez*, U.S. Department of Justice, Washington, DC, for Respondent

### DECISION GRANTING PETITIONER'S MOTION FOR ATTORNEYS' FEES AND COSTS[1]

On September 5, 2019, Mary Jones ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. § 300aa-10, *et seq*.[2] (the "Vaccine Act" or "Program"), alleging that she developed Guillain-Barré syndrome ("GBS") and peripheral neuropathy as a result of the influenza ("flu") vaccination she received on December 8, 2016, or in the alternative, that her GBS and peripheral neuropathy were significantly aggravated by the flu vaccine. ECF No. 1 at 1 ("Pet.").

---

[1] Because this Decision contains a reasoned explanation for the action in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755 (codified as amended at 42 U.S.C. §§ 300aa-10–34 (2012)) (hereinafter "Vaccine Act" or "the Act"). All subsequent references to sections of the Vaccine Act shall be to the pertinent subparagraph of 42 U.S.C. § 300aa.

1

On December 20, 2022, Petitioner filed a motion for a decision dismissing her petition. ECF No. 54. I granted the motion and dismissed the petition on December 21, 2022. ECF No. 55.

Petitioner now moves for an award of attorneys' fees and costs. For the reasons discussed below, I find that the petition articulates a reasonable basis; accordingly, I **GRANT IN PART** Petitioner's motion and award her a total of **$29,192.28** in attorneys' fees and costs.

## I.   Procedural History

On September 5, 2019, Petitioner filed her petition for compensation. Pet. Petitioner filed medical records on September 16, 2019, February 17, 2020, and March 23, 2020. Exs. 1-6, 8-13. Petitioner also filed a Statement of Completion on May 29, 2020. ECF No. 22. Per this Court's order, Petitioner filed more medical records on July 1 and August 31, 2020. Exs. 14-17.

On February 10, 2021, Respondent filed his Rule 4(c) Report stating that compensation was not appropriate in Petitioner's case. ECF No. 37 at 1. Respondent argued that Petitioner's medical records did not support a diagnosis of GBS, and that Petitioner had not provided sufficient evidence of significant aggravation or of severity. *Id.* at 10-13. Respondent also contended that Petitioner's claim lacked a reasonable basis because she had never been diagnosed with GBS and because Petitioner's treating physicians attributed her condition to factors other than the flu vaccine. *Id.* at 13-14.

On April 12, 2021, I ordered Petitioner to file an expert report within 60 days. After several motions for extension of this deadline, I held a status conference with the parties on November 1, 2022. ECF No. 52. Mr. Sadaka indicated that Petitioner needed to undergo additional testing in order for Petitioner's expert to produce a report. *Id.* He stated that, if she was unwilling to undergo such testing, he would speak to her about withdrawing her claim for compensation. *Id.*

On December 20, 2022, Petitioner filed a motion for a decision dismissing her petition, indicating that she "does intend to protect her rights to file a civil action in the future." Pet'r's Mot., ECF No. 54 at 2. I granted the motion and dismissed the petition on December 21, 2022. ECF No. 55. On May 5, 2023, Petitioner filed her election to file a civil action pursuant to 42 U.S.C. § 300aa-21(a). ECF No. 62.

On January 23, 2023, Petitioner filed her motion for attorneys' fees and costs. ECF No. 56 ("Fees Application" or "Fees App."). Respondent filed his response in opposition on February 13, 2023. ECF No. 60 ("Fees Resp."). Petitioner filed her reply on February 21, 2023. ECF No. 61 ("Fees Reply").

This matter is now ripe for adjudication.

## II.   Petitioner's Relevant Medical History

### A. Pre-Vaccination Medical History

Petitioner's medical history prior to receiving the allegedly causal flu vaccine is significant for obesity, hypertension, mitral valve prolapse, aortic regurgitation, stroke, heart attack,

2

osteoporosis, sciatica, idiopathic peripheral neuropathy, urinary incontinence, diverticular disease, macrocytic anemia with possible myelodysplastic syndrome, partial hysterectomy, partial thyroidectomy, and left ankle surgery. Ex. 1 at 34, 38, 520-25; Ex. 2 at 24, 69, 206; Ex. 10 at 4; Ex. 11 at 1-10; Ex. 13 at 110; Ex. 14 at 51.

On February 5, 2014, Petitioner saw Michael Frost, FNP-BC, at the Pain Center of Arizona for pain in her low back and right upper extremity. Ex. 12 at 1-14. Petitioner reported a history of sciatica with lower extremity weakness and urinary urgency, incontinence, and nocturia.[3] *Id.* Petitioner had taken Lyrica for muscle aches, hydrocodone, and gabapentin for sciatica. *Id.* at 7. Nurse Frost's examination revealed decreased deep tendon reflexes in Petitioner's lower extremities. *Id.* Petitioner was referred for physical therapy ("PT"). *Id.* at 6.

On April 10, 2014, Petitioner underwent a lumbar spine MRI for low back pain that radiated through her right hip, leg, and foot. Ex. 11 at 9. The MRI revealed very minor disc bulges at L3-4, L4-5, and L5-S1, with no spinal stenosis or foraminal narrowing. *Id.* A cervical spine MRI the following day revealed mild degenerative spondylosis. *Id.* at 5.

On October 24, 2016, Petitioner reported to the emergency room complaining of four days of generalized fatigue and headaches. Ex. 17 at 467-85. Petitioner's physical examination and workup were unremarkable, and she was discharged with pain medication. *Id.*

On November 10, 2016, Petitioner saw ophthalmologist Terrell Hemelt, MD, for sharp pain on the left side of her head and changes in her vision. Ex. 8 at 1-4. Dr. Hemelt's diagnosis was glaucoma. *Id.* at 3. Petitioner saw Dr. Hemelt again on November 23, 2016, complaining of pain in her right eye and generalized fatigue. *Id.* at 5-6. Dr. Hemelt recommended a temporal artery biopsy. *Id.* at 6. He prescribed a steroid treatment (prednisone) and deferred the tapering to Petitioner's primary care doctor. *Id.* at 7. Petitioner underwent a right temporal artery biopsy on December 2, 2016. Ex. 2 at 194, 388. The results of her biopsy were normal. Ex. 8 at 7.

On December 1, 2016, Petitioner saw her primary care doctor, Delora Denney, MD. Ex. 2 at 253-60. Petitioner reported a history of right temporal pain, generalized fatigue, muscle aches, muscle weakness, generalized numbness, and urinary incontinence. *Id.* at 254-55. Dr. Denney's assessment included obstructive sleep apnea, a thyroid nodule, diverticulitis, myelodysplastic syndrome,[4] and carotid bruit. *Id.* at 256-57. Petitioner denied taking Lyrica. *Id.* at 257-58. Petitioner returned to Dr. Denney on December 8, 2016, complaining of severe pain in her jaw and face and issues with mental focus since starting steroids. *Id.* at 249-52. Dr. Denney suspected

---

[3] Nocturia is "urinary frequency at night." DORLAND'S MEDICAL DICTIONARY ONLINE (hereinafter "DORLAND'S"), https://www.dorlandsonline.com/dorland/definition?id=34172 (last visited on July 10, 2023).

[4] Myelodysplastic syndrome, also called preleukemia, is "any of a group of related bone marrow disorders of varying duration preceding the development of overt acute myelogenous leukemia." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=111042 (last visited on July 10, 2023).

possible temporomandibular joint disorder ("TMJ")[5] or sinusitis and recommended that Petitioner taper off her dose of the steroid treatment over a period of nine days. *Id.* at 252. Petitioner also received the allegedly causal flu vaccination at this appointment. *Id.*

### B. Post-Vaccination Medical History

Twenty-six days later, on January 3, 2017, Petitioner returned to Dr. Denney complaining of memory loss, nasal congestion, tooth pain, right shoulder pain, left knee pain, bilateral hip pain, and worsening generalized weakness, and worsening urinary incontinence. Ex. 2 at 246-49. Petitioner stated that she had spent most of New Year's Eve and New Year's Day in bed. *Id.* at 248. Dr. Denney included "idiopathic peripheral neuropathy onset 12/01/16 – patient says some type of autonomic" in the list of problems reviewed. *Id.* at 247. Dr. Denney's assessment included osteoporosis, mixed urinary incontinence, and muscle weakness. *Id.* at 248-49.

On January 4, 2017, Petitioner underwent bone density analysis of her lumbar spine and both hips. Ex. 2 at 221-27. The results for her right hip were consistent with osteopenia[6] and the results for her left hip and lumbar spine were consistent with osteoporosis. *Id.* at 224.

On January 5, 2017, Petitioner reported to the emergency room at Slidell Memorial Hospital in Slidell, Louisiana, complaining of two days of pain and swelling in her right knee and leg with difficulty walking, swelling in her left eye, and generalized weakness. Ex. 1 at 38-42. The emergency physician noted that Petitioner had taken prednisone for three weeks and discontinued it two weeks earlier. *Id.* at 38. Petitioner reported that she began feeling fatigued when she discontinued the steroid regimen and that this had worsened in the interim. *Id.* Examination revealed that Petitioner's strength and range of motion were normal in all limbs except her right leg secondary to pain. *Id.* at 39. Petitioner's blood potassium was low. *Id.* at 40. Petitioner was admitted for evaluation of possible septic arthritis and bone fracture secondary to osteoarthritis. *Id.* A second emergency physician saw Petitioner the same day and suggested that Petitioner's low potassium may have resulted from the abrupt cessation of steroid treatment two weeks prior. *Id.* at 9.

During her hospitalization, Petitioner had consults with orthopedics, hematology oncology, neurosurgery, and neurology. She saw orthopedist Charles Krieger, MD, on January 7, 2017. Ex. 1 at 27-31. Petitioner reported severe pain in her right hip and knee and Dr. Krieger diagnosed right knee osteoarthritis and sciatica. *Id.*

Petitioner saw Matthew McElveen, MD, for a hematology oncology consult on January 9, 2017. Ex. 1 at 13-17. Dr. McElveen noted that Petitioner's bone marrow analyses had been stable over a period of several years and expressed doubt that she actually had myelodysplastic syndrome as originally suspected. *Id.* at 13.

---

[5] TMJ is "chronic facial pain associated with dysfunction of some combination of the temporomandibular joint, jaw muscles, and associated nerves." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=71240 (last visited on July 10, 2023).

[6] Osteopenia is "any decrease in bone mass below the normal." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=35878 (last visited on July 17, 2023).

4

That same day, Petitioner saw neurologist Greg Redmann, MD, regarding the weakness in her leg. *Id.* at 18-20. Dr. Redmann included "possible Guillain-Barré" in his differential diagnosis and ordered a spinal tap. *Id.* at 18. He added that if the protein in Petitioner's cerebrospinal fluid ("CSF") was "at all elevated, this would be consistent with [GBS]," and that he would treat her with either IVIG or plasma exchange in that case. *Id.* He recommended increasing Petitioner's dosage of Lyrica. *Id.*

On January 11, 2017, Petitioner saw neurosurgeon Joseph Epps, MD. Ex. 1 at 22-26. Dr. Epps noted that Petitioner's lumbar spine MRI showed mild spondylolisthesis without evidence of significant root compression and no spinal stenosis. *Id.* at 26. He also noted that Petitioner's spinal tap showed normal cell counts and normal levels of protein and glucose. *Id.* at 22. Petitioner was not treated with IVIG or plasma exchange. *Id.*

Throughout her hospitalization, physical examinations revealed that Petitioner's motor strength was +5/5 and her deep tendon reflexes were +1 in all extremities.[7] Ex. 1, *passim*. Petitioner was discharged on January 12, 2017. *Id.* at 5-8. The discharging physician, Evan Summers, MD, noted that he did not believe that Petitioner's symptoms were related to her flu vaccination and commented that Petitioner had "markedly improved at time of discharge." *Id.* Her discharge diagnosis included right knee osteoarthritis and effusion, chronic macrocytic anemia, possible acute sigmoid diverticulitis, and anterolisthesis of L5 on S1 with mild foraminal narrowing. *Id.* Petitioner also had an elevated erythrocyte sedimentation rate ("ESR")[8] at the time of her discharge. *Id.* at 5. Petitioner was directed to continue taking gabapentin. *Id.* at 7.

---

[7] "By convention the deep tendon reflexes are graded as follows:

- 0 = no response; always abnormal
- 1+ = a slight but definitely present response; may or may not be normal
- 2+ = a brisk response; normal
- 3+ = a very brisk response; may or may not be normal
- 4+ = a tap elicits a repeating reflex (clonus); always abnormal

Whether the 1 + and 3 + responses are normal depends on what they were previously, that is, the patient's reflex history; what the other reflexes are; and analysis of associated findings such as muscle tone, muscle strength, or other evidence of disease. Asymmetry of reflexes suggests abnormality." H. KENNETH WALKER, CLINICAL METHODS: THE HISTORY, PHYSICAL, AND LABORATORY EXAMINATIONS 365 (H. Kenneth Walker, et al. eds., 3rd ed., 1990).

[8] Erythrocyte sedimentation rate is "the rate at which erythrocytes precipitate out from a well-mixed specimen of venous blood, measured by the distance the top of the column of erythrocytes falls in a given time interval under specified conditions; an increase in rate is usually due to elevated levels of plasma proteins, especially fibrinogen and immunoglobulins, which decrease the zeta potential on erythrocytes by dielectric shielding and thus promote rouleau formation. It is increased in monoclonal gammopathy, hypergammaglobulinemia due to inflammatory disease, hyperfibrinogenemia, active inflammatory disease, and anemia." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=102146 (last visited on July 17, 2023).

On discharge from the hospital, Petitioner was transferred to Greenbriar Community Care Center in Slidell, Louisiana. Ex. 1 at 404; Ex. 2 at 289-94. Petitioner underwent PT five times per week and was discharged on January 24, 2017. Ex. 2 at 311. Her diagnosis at discharge was right knee effusion, right knee arthritis, and unspecified polyneuropathy. *Id.* Petitioner "demonstrate[d] good progress" and had "improved functional endurance" at the time of her discharge. *Id.* Petitioner switched from Lyrica to gabapentin due to concerns about the cost of her medication. Ex. 2 at 216.

On February 6, 2017, Petitioner saw Dr. Denney for a post-hospitalization follow-up. Ex. 2 at 70-74. Petitioner reported that she had been transferred to Greenbriar because of continuing pain in her legs that was so severe that she could not move them. *Id.* at 72. Petitioner also reported that "[a]t some point she felt a tingle on the right side of her spine and suddenly she could move her legs and the pain was improved…[s]he says her only pain now is 2/10." *Id.* at 73. Dr. Denney suggested that Petitioner's low blood potassium "may be related to being on steroids" and referred Petitioner to a rheumatologist. *Id.*

On February 22, 2017, Petitioner saw neurologist Daniel Chehebar, DO, reporting an episode of bilateral lower extremity paralysis and painful paresthesias.[9] Ex. 2 at 29-36. Physical examination revealed intact cranial nerve exam, normal muscle tone, +5/5 bilateral upper extremity strength, and +4/5 bilateral lower extremity strength. *Id.* at 32. Her reflexes were 2+ with the exception of her right and left Achilles, which were 1+. *Id.* at 34. Dr. Chehebar noted that, during her recent hospitalization, Petitioner did not undergo plasma exchange and did not recall receiving IVIG. *Id.* at 29. Dr. Chehebar noted Petitioner's recent flu vaccination and that Petitioner had "abruptly discontinued prednisone…relatively soon prior to the onset of her symptoms." *Id.* at 29-30. Dr. Chehebar's assessment was possible inflammatory lumbosacral plexopathy and ocular migraine. *Id.* at 35. He opined that clinical examination and prior lab work "did not seem completely consistent with [GBS]." *Id.* In particular, Dr. Chehebar believed that the acute onset of Petitioner's pain with no ascending weakness[10] and the fact that she was not treated with plasma exchange or IVIG were not suggestive of GBS. *Id.* at 35-36. He suggested that Petitioner's symptoms may have been an episode of acute steroid withdrawal. *Id.* at 36.

On April 25, 2017, Petitioner returned to Dr. Denney for a follow-up. Ex. 2 at 214-18. She reported that she was feeling better and was able to walk despite some knee pain and inquired about vitamin B12 replacements. *Id.* at 217.

On June 6, 2017, Petitioner saw Dr. Denney for another follow-up. Ex. 2 at 210-14. She reported that she was feeling "much better" and had less pain and sensations of heaviness in her limbs since starting B12 injections. *Id.* at 213. She also reported that she was having "very little

---

[9] Paresthesia is "an abnormal touch sensation, such as burning, prickling, or formication, often in the absence of an external stimulus." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=37052 (last visited on July 11, 2023).

[10] Although Dr. Chehebar noted that Petitioner did not experience ascending weakness in this medical record, Petitioner contends that after experiencing numbness and tingling in her legs, she felt "the numbness progressing up [her] body." Ex. 7 at 2.

joint pain." *Id.* Petitioner underwent blood work that showed a positive antinuclear antibody ("ANA")[11] result and a homogeneous ANA pattern consistent with systemic lupus erythematosus ("SLE").[12] *Id.* at 323.

On June 20, 2017, Petitioner reported to the emergency room complaining of chest pain that radiated to her left arm and bilateral upper quadrants and shortness of breath. Ex. 17 at 368-75. She reported that the pain had begun suddenly the previous evening and that Petitioner was under a lot of stress due to personal issues. *Id.* at 368. She was discharged that day with a diagnosis of atypical chest pain and anxiety. *Id.* at 375.

On June 26, 2017, Petitioner saw neurologist Michael Mitchell, MD, to follow-up on the "cerebrovascular accident" that caused her hospitalization the previous January. Ex. 2 at 103-05. Dr. Mitchell noted that Petitioner began a course of high-dose steroids in November 2016 and stopped taking them abruptly. *Id.* at 103. He referred to Petitioner's symptoms the previous January as "short-lived" and remarked that they "resolved spontaneously." He noted that Petitioner's neurological workup and spinal tap were normal and opined that "[h]er symptoms may have been due to abrupt discontinuation of high dose steroids." *Id.* at 105. He noted that her deep tendon reflexes were diminished throughout all four extremities. *Id.* He listed the flu vaccine under "Allergies" in the record of Petitioner's visit. *Id.* at 103-04.

On June 27, 2017, Petitioner returned to Dr. Denney regarding symptoms of depression and stress related to her personal relationship with her partner of several years. Ex. 2 at 205-07. Petitioner did not complain of physical pain or weakness during this appointment, but idiopathic peripheral neuropathy is listed as a previous diagnosis in the medical record. *Id.*

Petitioner relocated to Anaheim, California, in mid-2017. On October 18, 2017, she saw Jim Tran, DO, for an initial visit and "evaluation of anemia, C-reactive protein for inflammation, and kidneys." Ex. 3 at 28. Petitioner reported that she had been hospitalized in January 2017 for "paralysis of both legs" and radiculopathy, but that no cause was identified. *Id.*

On January 18, 2018, Petitioner saw Ana Ivanova, MD. Ex. 3 at 16-19. In the "History of Present Illness" section of the record, Dr. Ivanova listed "discuss prior [history of] [lower

---

[11] Antinuclear antibodies are "antibodies directed against nuclear antigens; ones against a variety of different antigens are almost invariably found in systemic lupus erythematosus and are frequently found in rheumatoid arthritis, scleroderma (systemic sclerosis), Sjögren syndrome, and mixed connective tissue disease." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=56804 (last visited on July 17, 2023).

[12] Systemic lupus erythematosus is "a chronic, inflammatory, often febrile multisystemic disorder of connective tissue that proceeds through remissions and relapses; it may be either acute or insidious in onset and is characterized principally by involvement of the skin *(cutaneous l. erythematosus),* joints, kidneys, and serosal membranes … The condition is marked by a wide variety of abnormalities, including arthritis, arthralgias, nephritis, central nervous system manifestations, pleurisy, pericarditis, leukopenia or thrombocytopenia, hemolytic anemia, an elevated erythrocyte sedimentation rate, and the presence in the blood of distinctive cells called LE cells." DORLAND'S, https://www.dorlandsonline.com/dorland/definition?id=87476 (last visited on July 17, 2023).

extremity] paralysis assoc[iated] with vaccination - ?Guillain-Barre – persisting weakness and [urinary incontinence]." *Id.* at 16. Examination showed that Petitioner was confused and had bilateral lower extremity weakness. *Id.* at 17. Dr. Ivanova's assessment included "Sequelae of Guillain-Barre syndrome." *Id.* at 19.

Petitioner saw primary care doctors several times between June 2018 through September 2019, reporting a variety of issues including urinary tract infections, anxiety, hypertension, myelodysplastic syndrome, neuropathic arthropathy, neuropathy, and fatigue. Ex. 10 at 2-84. Many of Petitioner's medical records during this period list Flucelvax as one of her allergies. *E.g.*, Ex. 10 at 7, 13, 19. Per the FDA, Flucelvax is a quadrivalent flu vaccine manufactured by Seqirus, Inc. FOOD & DRUG ADMIN., FLUCELVAX QUADRIVALENT (2023). Petitioner's medical records also reflect that the allegedly causal flu vaccine she received on December 8, 2016, was Fluzone, manufactured by Sanofi Pasteur. Ex. 2 at 71, 252. No explanation is given for this discrepancy.

No other pertinent medical records have been filed.

### III.    Petitioner's Affidavit

Petitioner filed her affidavit on November 15, 2019. Ex. 7. In it, she states that she received the flu vaccine on December 8, 2016, and she began to feel weak and run down shortly after. *Id.* at 1. At first, Petitioner suspected that her symptoms were caused by anemia as she had experienced anemia in the past, but her symptoms persisted longer and were more severe than they had been previously. *Id.* She stated that she spent significant time in bed over New Year's that year. *Id.*

Petitioner stated that she felt extremely tired on January 5, 2017. Ex. 7 at 2. While grocery shopping that day, she had trouble walking because her legs felt "sluggish." *Id.* She completed her shopping and went home, where she began to experience "extreme pain, numbness, and tingling in [her] legs." *Id.* She had difficulty moving her legs and standing up. *Id.* Petitioner's daughter drove her to the emergency room. *Id.* On the way there, Petitioner began to simultaneously feel pain and numbness resembling paralysis in her legs. *Id.* She stated that when she arrived at the hospital, the numbness was progressing up her body and affecting her arms. *Id.*

Petitioner described her eight-day hospital stay in January 2017 as "frustrating" because she required assistance with mobility and daily tasks including getting out of bed. Ex. 7 at 2. She required adult diapers due to loss of bladder control. *Id.* at 2-3. She stated that she gradually regained sensation in her legs and was discharged to a nursing home, where she underwent PT for three weeks. *Id.* at 3. After discharge from the nursing home, Petitioner stated that she had home visits from a physical therapist and still relied on a wheelchair and walker. *Id.* She made progress in PT and regained upper and lower body strength. *Id.* She also stated that she continued to suffer from incontinence, which was ongoing at the time of filing her affidavit. *Id.*

Petitioner stated that her illness has been "devastating." Ex. 7 at 3. She stated that prior to her illness, she was happy, active, and engaged to be married. *Id.* Since becoming ill, her engagement has ended. *Id.*

Petitioner averred that in August 2017, she relocated to California to assist her son with the care of her grandchildren. Ex. 7 at 3. She continued to feel run down and have "issues with [her]

8

legs." *Id.* at 4. Petitioner stated that Dr. Ivanova told her that she seemed to be suffering from sequelae of GBS following her flu vaccine. *Id.* Petitioner stated that she felt relieved to know what had caused her health issues. *Id.*

Petitioner concluded by stating that her illness has made her feel isolated. Ex. 7 at 4. She continues to have pain and weakness, but the incontinence is the most difficult issue. *Id.* Petitioner stated that she "feel[s] every bit of [her] 70 years and mourn[s] what [her] life would have been like if [she] had not been struck with this injury." *Id.*

## IV.   Parties' Arguments

### A.   Petitioner's Application

In her application, Petitioner argues that her petition was filed in good faith because she received a vaccine covered by the Act and because her petition was timely filed. Fees App. at 3. She further argues that reasonable basis existed throughout the pendency of her claim. *Id.* She cites the medical record, pointing out that she began experiencing weakness and loss of muscle strength on January 3, 2017. *Id.* (citing Ex. 2 at 246-49). She also notes that she experienced worsening weakness and right leg pain that led to her hospitalization on January 5. *Id.* at 4 (citing Ex. 1 at 9-12). Petitioner notes that Dr. Redmann, her neurologist, listed GBS in his differential diagnosis during her hospitalization. *Id.* (citing Ex. 1 at 18-20). Finally, Petitioner notes that Dr. Ivanova "assessed the petitioner as suffering from sequelae of GBS." *Id.*

### B.   Respondent's Response

In his response to the application, Respondent states that he does not challenge Petitioner's assertion that her claim was filed in good faith. Fees Resp. at 15. Respondent argues that there is no reasonable basis for Petitioner's claim that the flu vaccine caused or significantly aggravated GBS or peripheral neuropathy. *Id.*

Respondent states that the medical records contradict Petitioner's claim. Fees Resp. at 15. Specifically, Respondent contends that "[t]here is not a scintilla of objective evidence that petitioner ever had GBS" because she was never diagnosed with GBS and never treated for it. *Id.* Respondent notes that several of Petitioner's providers attributed her symptoms to other causes. *Id.* (citing Ex. 1 at 27 (orthopedist Dr. Krieger diagnosed osteoarthritis and sciatica); Ex. 1 at 218 (neurosurgeon Dr. Epps did not believe that Petitioner had a neurological emergency and that her inability to walk was "due to her knee and neuropathy"); Ex. 2 at 36 (neurologist Dr. Chehebar expressed doubt that Petitioner had GBS); Ex. 2 at 105 (neurologist Dr. Mitchell did not discuss GBS after examining Petitioner)). The emergency room physician Petitioner saw on January 5, 2017, noted that Petitioner had abruptly stopped taking the steroid prednisone roughly two weeks before. Ex. 1 at 38. Finally, Dr. Summers stated in Petitioner's discharge summary on January 13 that he did not feel that Petitioner's symptoms were related to the flu vaccine. *Id.* at 5.

Respondent also cites Petitioner's failure to file an expert report as support for his position that the claim lacks a reasonable basis. Fees Resp. at 16. He notes that, while the absence of an expert report does not necessarily preclude a finding that reasonable basis exists, Petitioner "had

9

an extended opportunity, over a year and a half, to file an expert report in support of vaccine causation, and was unable to do so." *Id.*

Respondent acknowledges that Dr. Redmann included GBS in his differential diagnosis of Petitioner, but notes that Dr. Redmann also ordered a spinal tab, the results of which showed normal protein levels in Petitioner's CSF. Fees Resp. at 17. Respondent also notes that Petitioner was never treated with IVIG or plasma exchange. *Id.* He also notes that GBS was removed from the differential diagnosis during Petitioner's hospitalization in January 2017. *Id.* (citing, generally, Ex. 1).

Respondent takes issue with Petitioner's reliance on Dr. Ivanova's notation regarding GBS sequelae. Fees Resp. at 17. He argues that Dr. Ivanova included this in her assessment "based on petitioner's reporting that she had suffered from possible GBS in January 2017," and that Petitioner's report was inconsistent with her report to Dr. Tran on October 18, 2017, that she had had a workup done in January 2017 and "nothing [was] found." *Id.* Respondent also points out that Dr. Ivanova is a primary care physician, not a neurologist, and that "she lacks specialized training and expertise in the area of diagnosing GBS and related sequelae." *Id.*

Respondent argues that the medical record evidence is "so deficient that [Petitioner's] expert was not able to even render an opinion" without additional objective testing of Petitioner. Fees Resp. at 18 (citing ECF Nos. 48, 51).

Respondent also challenges Petitioner's claim of reasonable basis on the grounds that there is insufficient objective evidence that Petitioner suffered any vaccine-related injury or significant aggravation with residual effects lasting more than six months (*i.e.*, the severity requirement). Fees Resp. at 18. Respondent points out that on February 22, 2017 (roughly 2.5 months[13] post vaccination), neurologist Dr. Chehebar stated that he did "not feel [Petitioner] needs further neurological workup." *Id.* (citing Ex. 2 at 36). Furthermore, Respondent notes that neurologist Dr. Mitchell commented that Petitioner's symptoms in January 2017 were "short lived and resolved spontaneously," and that Petitioner's neurological workup at the time was normal. *Id.* (citing Ex. 2 at 105). Dr. Mitchell also declined to pursue further neurological workup of Petitioner. Ex. 2 at 105.

Respondent argues that "Petitioner's condition as of April 2017 mirrored her condition prior to vaccination." Fees Resp. at 19. He states that Petitioner's medical records prior to vaccination document a history of sciatica and lower extremity weakness, decreased deep tendon reflexes in her lower extremities, urinary incontinence, anemia, and fatigue. *Id.* (citing Ex. 12 at 3-7; Ex. 11 at 9; Ex. 2 at 216-17; Ex. 8 at 5-6; Ex. 17 at 467-85.). Respondent also argues that Dr. Denney's June 2017 assessment of peripheral neuropathy was in fact not new, and that Petitioner's history of peripheral neuropathy is documented on December 1, 2016, a week prior to vaccination. *Id.* (citing Ex. 2 at 253-60)).

---

[13] Respondent refers to this appointment as having taken place "just one-month post-vaccination," which the Court construes as a typographical error. Fees Resp. at 18.

Respondent concludes by arguing that Petitioner "has provided no objective evidence beyond her own assertion that she suffered a vaccine-related injury."

### C. Petitioner's Reply

In her reply, Petitioner maintains that the objective evidence in the record amounts to more than a scintilla as required for a finding of reasonable basis. Fees Reply at 5. She asserts that her petition was timely filed, and that onset of her symptoms occurred within a medically appropriate timeframe of less than 30 days post-vaccination. *Id.* at 5-6.

Petitioner acknowledges that her pre-vaccination medical history is "complex" and included "a history of stable peripheral neuropathy." Fees Reply at 6. She argues that only after vaccination did she lose the use of her legs, requiring PT and inpatient treatment. *Id.*

Petitioner emphasizes that two of her providers, Drs. Redmann and Chehebar, considered GBS as a possible diagnosis, and that Dr. Ivanova included "sequelae of GBS" in her assessment. Fees Reply at 6 (citing Ex. 1 at 18; Ex. 2 at 35-36; Ex. 3 at 19). Petitioner also notes that Dr. Mitchell included the flu vaccine in the list of Petitioner's allergies. *Id.* (citing Ex. 2 at 104). These facts, Petitioner argues, constitute more than a mere scintilla of evidence that the flu vaccine caused her injury. *Id.* at 6-7.

Petitioner argues that her medical history "is consistent with a worsening or significant aggravation, or even new onset peripheral neuropathy within 30 days following her influenza vaccine and that injury lasted six months." Fees Reply at 7. She emphasizes that the onset of her lower extremity weakness occurred after she received the flu vaccine and that her injury was severe enough to require inpatient care by a neurologist. *Id.* She also argues that her elevated ESR during her January 2017 hospitalization supports her assertion that she had GBS. *Id.* at 8.

Petitioner concludes by stating that her failure to produce an expert report "has nothing to do with the reasonableness of her claim." Fees Reply at 9. Petitioner argues that her expert asked that she undergo a nerve conduction study, but that she was unable to do so due to the expense, the distance she would have to travel, and recent cardiac issues she had experienced. *Id.* Rather than pursuing additional testing, Petitioner argues that she opted to voluntarily dismiss her claim and move on with her life. *Id.*

## V. Legal Standard

### A. Good Faith

The good faith requirement is met through a subjective inquiry. *Di Roma v. Sec'y of Health & Hum. Servs.*, No. 90-3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Such a requirement is a "subjective standard that focuses upon whether [P]etitioner honestly believed he had a legitimate claim for compensation." *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *5 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Without evidence of bad faith, "petitioners are entitled to a presumption of good faith." *Grice v. Sec'y of Health & Hum. Servs.*, 36 Fed. Cl. 114, 121 (1996). Thus, so long as Petitioner had an honest belief that her claim could succeed, the good faith requirement is satisfied. *See Riley v. Sec'y of Health & Hum. Servs.*,

No. 09-276V, 2011 WL 2036976, at *2 (Fed. Cl. Spec. Mstr. Apr. 29, 2011) (citing *Di Roma*, 1993 WL 496981, at *1); *Turner*, 2007 WL 4410030, at *5.

### B. Reasonable Basis

Unlike the good-faith inquiry, an analysis of reasonable basis requires more than just a petitioner's belief in his claim. *Turner v. Sec'y of Health & Hum. Servs.*, No. 99-544V, 2007 WL 4410030, at *6-7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). Instead, the claim must be supported by objective evidence. *Simmons v. Sec'y of Health & Hum. Servs.*, 875 F.3d 632, 636 (Fed. Cir. 2017).

While the statute does not define the quantum of proof needed to establish reasonable basis, it is "something less than the preponderant evidence ultimately required to prevail on one's vaccine-injury claim." *Chuisano v. United States,* 116 Fed. Cl. 276, 283 (2014). The Court of Federal Claims affirmed in *Chuisano* that "[a]t the most basic level, a petitioner who submits no evidence would not be found to have reasonable basis…." *Id.* at 286. The Court in *Chuisano* found that a petition which relies on temporal proximity and a petitioner's affidavit is not sufficient to establish reasonable basis. *Id.* at 290; *see also Turpin v. Sec'y Health & Hum. Servs.*, No. 99-564V, 2005 WL 1026714, *2 (Fed. Cl. Spec. Mstr. Feb. 10, 2005) (finding no reasonable basis when petitioner submitted an affidavit and no other records); *Brown v. Sec'y Health & Hum. Servs.*, No. 99-539V, 2005 WL 1026713, *2 (Fed. Cl. Spec. Mstr. Mar. 11, 2005) (finding no reasonable basis when petitioner presented only e-mails between her and her attorney). The Federal Circuit has affirmed that "more than a mere scintilla but less than a preponderance of proof could provide sufficient grounds for a special master to find reasonable basis." *Cottingham v. Sec'y of Health & Hum. Servs.*, 971 F.3d 1337, 1346 (Fed. Cir. 2020) (finding Petitioner submitted objective evidence supporting causation when she submitted medical records and a vaccine package insert); *see also James-Cornelius*, 984 F.3d at 1380 (finding that "the lack of an express medical opinion on causation did not by itself negate the claim's reasonable basis.").

Temporal proximity between vaccination and onset of symptoms is a necessary component in establishing causation in non-Table cases, but without more, temporal proximity alone "fails to establish a reasonable basis for a vaccine claim." *Chuisano*, 116 Fed. Cl. at 291.

"[I]n deciding reasonable basis the [s]pecial [m]aster needs to focus on the requirements for a petition under the Vaccine Act to determine if the elements have been asserted with sufficient evidence to make a feasible claim for recovery." *Santacroce v. Sec'y of Health & Hum. Servs.*, No. 15-555V, 2018 WL 405121, at *7 (Fed. Cl. Spec. Mstr. Jan. 5, 2018). Special masters cannot award compensation "based on the claims of petitioner alone, unsubstantiated by medical records or by medical opinion." 42 U.S.C. § 300aa-13(a)(1).

When determining if a reasonable basis exists, many special masters and judges consider a myriad of factors. The factors to be considered may include "the factual basis of the claim, the medical and scientific support for the claim, the novelty of the vaccine, and the novelty of the theory of causation." *Amankwaa*, 138 Fed. Cl. at 289. This approach allows the special master to look at each application for attorneys' fees and costs on a case-by-case basis. *Hamrick v. Sec'y of Health & Hum. Servs.*, No. 99-683V, 2007 WL 4793152, at *4 (Fed. Cl. Spec. Mstr. Nov. 19, 2007).

12

### C. Elements of a *prima facie* Case

The Vaccine Act requires petitioners to provide objective evidence of five elements to make out a *prima facie* case for compensation:

1. The Petitioner received a vaccine set forth in the Vaccine Injury Table;

2. The Petitioner received a vaccine in the United States or outside of the United States under some special circumstances;

3. The Petitioner's injuries or death were caused by the vaccine (either by showing that the injury was one listed on the Vaccine Injury Table, or by making out a prima facie case of causation-in-fact), or the vaccine significantly aggravated a pre-existing injury;

4. The Petitioner experienced the residual effects of the injury for more than six months, died, or required an in-patient hospitalization with surgical intervention; and

5. The Petitioner has not previously collected an award or settlement of a civil action for damages for such vaccine-related injury or death.

42 U.S.C. § 300aa-11(c)(1)(A)-(E). In order to establish reasonable basis, a Petitioner must present objective evidence as to each of these elements. *Cottingham*, 971 F.3d at 1344, 1345-46.

## VI. Discussion

### A. Good Faith

In her application for fees, Petitioner does not make specific arguments regarding good faith. She states that she timely filed her petition and that she received a vaccine covered by the Act. Fees App. at 3.

Respondent does not challenge Petitioner's assertion of good faith in this case. Fees Resp. at 15. I find that the record does not contain evidence of bad faith, and thus that Petitioner is entitled to the presumption of good faith under *Grice*. 36 Fed. Cl. at 121. Accordingly, I find that Petitioner has satisfied the subjective standard for good faith.

### B. Reasonable Basis

As noted above, the standard for establishing reasonable basis is lower than that required to prevail on a vaccine-injury claim. *Chuisano*, 116 Fed. Cl. 276 at 287. However, Petitioner is still required to provide some evidence that her injury was caused or significantly aggravated by the flu vaccine she received. In the absence of expert opinion and medical literature, Petitioner's argument that the flu vaccine caused or significantly aggravated her injury relies entirely on the medical records and Petitioner's affidavit.

If Petitioner provides more than a mere scintilla of evidence that she suffered a Table injury, her claim that her petition had a reasonable basis can be supported by the presumption of

vaccine causation afforded to Table claims. *Bostic v. Sec'y of Health & Hum. Servs.*, No. 22-1118V, 2023 WL 4486158, at *5 (Fed. Cl. Spec. Mstr. June 15, 2023) (citing § 300aa-11(c); *Cottingham*, 971 F.3d at 1345-46).

I find that Petitioner has provided evidence of causation or significant aggravation that is sufficient to establish a reasonable basis.

1. Petitioner's Evidence of GBS

The medical record in this case contains more than a mere scintilla of evidence that Petitioner suffered from GBS. Several of Petitioners' treating physicians documented that she had GBS or that they considered a GBS diagnosis in evaluating her condition. For example, Dr. Redmann, included "possible Guillain-Barré" in his differential diagnosis on January 9, 2017. Ex. 1 at 18. Dr. Redmann's suspicion that Petitioner may have GBS supports the conclusion that her clinical presentation was consistent with it, so much so that Dr. Redmann ordered a spinal tap to confirm and left instructions for treatment. The fact that Petitioner's spinal fluid did not document elevated protein is not dispositive on the issue of diagnosis.

Additionally, on January 18, 2018, Dr. Ivanova listed "discuss prior [history of] [lower extremity] paralysis assoc[iated] with vaccination - ?Guillain-Barre – persisting weakness and [urinary incontinence]" in the medical record. Ex. 3 at 16. Dr. Ivanova's assessment included "Sequelae of Guillain-Barre syndrome." *Id.* at 19. Petitioner had reported to Dr. Tran in October 2017 that the cause of her condition in January 2017 was unknown. Ex. 3 at 28. I find that it is most likely that Dr. Ivanova came to her own conclusion that Petitioner's symptoms were consistent with GBS sequelae.

I also note that some of Petitioner's symptoms documented in the medical record and described in her affidavit are consistent with GBS. For example, Petitioner described incontinence, as well as trouble walking due to a "sluggish" feeling in her legs, tingling, and numbness that progressed up her legs and began affecting her arms. Ex. 7 at 2-3. She also described generalized weakness. Ex. 1 at 38. Ascending weakness and numbness are particularly characteristic of GBS as is generalized muscle weakness. *Chinea v. Sec'y of Health & Hum. Servs.*, No. 15-095V, 2019 WL 1873322, at *28-29 (Fed. Cl. Spec. Mstr. Mar. 15, 2019), *mot. for rev. denied*, 144 Fed. Cl. 378 (2019).

Finally, on June 26, 2017, Dr. Mitchell included the flu vaccine in the list of Petitioner's allergies. Ex. 2 at 103-04. This suggests that he suspected that the flu vaccine had played some causative role in her condition and that it should not be administered to her in the future. Dr. Mitchell also documented that Petitioner's deep tendon reflexes were diminished in all four extremities. Loss of reflexes is a well-documented symptom of GBS. *See, e.g., Larson v. Sec'y of Health & Hum. Servs.*, No. 16-633V, 2023 WL 3765631, at *15 (Fed. Cl. Spec. Mstr. June 1, 2023) (citing expert testimony that loss of reflexes is characteristic of GBS).

Taken together, the above constitutes more than a mere scintilla of evidence that Petitioner suffered from GBS.

14

2. Onset of Petitioner's Condition

The parties do not dispute that Petitioner received the flu vaccine on December 8, 2016. Nor is there a dispute that Petitioner reported pain and generalized weakness on January 3, 2017 (26 days after vaccination), resulting in her hospitalization beginning on January 5, 2017 (28 days after vaccination). Ex. 2 at 246-49; Ex. 1 at 38-42. Furthermore, the medical record of Petitioner's January 3 appointment and Petitioner's affidavit state that she was experiencing significant weakness on December 31, 2016 (23 days after vaccination).

Because Petitioner has provided more than a mere scintilla of evidence that she suffered GBS and that onset of her symptoms occurred approximately 23 days after vaccination, I find that there is more than a mere scintilla of evidence that Petitioner suffered a Table injury. 42 C.F.R. § 100.3 (designating GBS with onset no less than three and no more than 42 days after seasonal flu vaccination as a Table injury). Accordingly, Petitioner's claim that her petition had a reasonable basis is entitled to the presumption of causation. *Bostic*, 2023 WL 4486158, at *5. Based on the totality of the evidence presented, I find that Petitioner has presented more than a mere scintilla of evidence that the flu vaccine caused or significantly aggravated her condition.

3. Severity

Respondent also argues that Petitioner has not satisfied the severity requirement. Fees Resp. at 18. The Vaccine Act requires a petitioner to demonstrate that the sequelae of the alleged vaccine-related injury lasted longer than six months. § 300aa–11(c)(1)(D).

On June 26, 2017, Dr. Mitchell recorded that Petitioner's deep tendon reflexes were diminished in all four extremities, which is a characteristic symptom of GBS. Ex. 2 at 105; *Larson*, 2023 WL 3765631, at *15. Furthermore, as discussed above, Dr. Ivanova's assessment of Petitioner on January 18, 2018, more than a year after onset of her condition, included "Sequelae of Guillain-Barre syndrome." Ex. 3 at 19. Finally, in her affidavit, signed on October 24, 2019, Petitioner states that she still experiences incontinence. Ex. 7 at 3. I find that these examples constitute more than a mere scintilla of evidence that the sequelae of Petitioner's injury lasted longer than six months. Accordingly, the severity requirement is met.

In light of the above, I find that Petitioner has satisfied the reasonable basis standard and is therefore entitled to an award of reasonable attorneys' fees and costs.

**VII. Reasonable Attorneys' Fees and Costs**

Section 15(e)(1) of the Vaccine Act allows for the Special Master to award "reasonable attorneys' fees, and other costs." § 300aa–15(e)(1)(A)–(B). Petitioners are entitled to an award of reasonable attorneys' fees and costs if they are entitled to compensation under the Vaccine Act, or, even if they are unsuccessful, they are eligible so long as the Special Master finds that the petition was filed in good faith and with a reasonable basis. *Avera v. Sec'y of Health & Hum. Servs.*, 515 F.3d 1343, 1352 (Fed. Cir. 2008). Above, I determined that Petitioner is entitled to a final award of reasonable attorneys' fees and costs.

It is "well within the special master's discretion" to determine the reasonableness of fees.

15

*Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521–22 (Fed. Cir. 1993); see also *Hines v. Sec'y of Health & Hum. Servs.*, 22 Cl. Ct. 750, 753 (1991) ("[T]he reviewing court must grant the special master wide latitude in determining the reasonableness of both attorneys' fees and costs."). Applications for attorneys' fees must include contemporaneous and specific billing records that indicate the work performed and the number of hours spent on said work. *See Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 316–18 (2008).

Reasonable hourly rates are determined by looking at the "prevailing market rate" in the relevant community. *See Blum v. Stenson*, 465 U.S. 886, 895 (1984). The "prevailing market rate" is akin to the rate "in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Id*. at 895, n.11. The petitioner bears the burden of providing adequate evidence to prove that the requested hourly rate is reasonable. *Id*.

**A. Attorneys' Fees**

Petitioner requests a total of $33,938.88 in attorneys' fees. Fees App. at 4.

1. <u>Reasonable Hourly Rates</u>

A reasonable hourly rate is defined as the rate "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Avera*, 515 F.3d at 1348 (quoting *Blum*, 465 U.S. at 896 n.11). In general, this rate is based on "the forum rate for the District of Columbia" rather than "the rate in the geographic area of the practice of [P]etitioner's attorney." *Rodriguez v. Sec'y of Health & Hum. Servs.*, 632 F.3d 1381, 1384 (Fed. Cir. 2011) (citing *Avera*, 515 F. 3d at 1349).

*McCulloch* provides the framework for determining the appropriate compensation for attorneys' fees based upon the attorneys' experience. *See McCulloch v. Sec'y of Health & Hum. Servs.*, No. 09–293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015). The Office of Special Masters has accepted the decision in *McCulloch* and has issued a Fee Schedule for subsequent years.[14]

---

[14] The 2017 Fee Schedule can be accessed at: https://www.uscfc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2017.pdf.
The 2018 Fee Schedule can be accessed at: https://www.uscfc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202018.pdf.
The 2019 Fee Schedule can be accessed at: https://www.uscfc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202019.pdf.
The 2020 Fee Schedule can be accessed at: http://www.cofc.uscourts.gov/sites/default/files/Attorneys%27%20Forum%20Rate%20Fee%20Schedule%202020.PPI_OL.pdf.
The 2021 Fee Schedule can be accessed at: http://www.cofc.uscourts.gov/sites/default/files/Attorneys-Forum-Rate-Fee-Schedule-2021-PPI-OL.pdf
The 2022 Fee Schedule can be accessed at: https://www.uscfc.uscourts.gov/sites/default/files/Attorneys%27-Forum-Rate-Fee-Schedule-2022-%28Final%29.pdf.
The hourly rates contained within the schedules are updated from the decision in *McCulloch*, 2015 WL 5634323.

Petitioner requests compensation for Mr. Sadaka at the following rates: $376.38 per hour for work performed in 2017; $396.00 per hour for work performed in 2018; $405.00 per hour for work performed in 2019; $422.00 per hour for work performed in 2020; $444.00 per hour for work performed in 2021; and $458.00 per hour for work performed in 2022. Fees App. at 4.

Petitioner also requests compensation for Mr. Sadaka's paralegal, Ms. Michelle Curry, at the following rates: $145.17 for work performed in 2017; $150.55 per hour for work performed in 2018; $156.00 per hour for work performed in 2019; $163.00 per hour for work performed in 2020; $172.00 per hour for work performed in 2021; and $177.00 per hour for work performed in 2022. Fees App. at 4.

These rates are consistent with what Mr. Sadaka and his paralegals have previously been awarded for their Vaccine Program work. *Sumrall v. Sec'y of Health & Hum. Servs.*, No. 17-1769, 2023 WL 3778888, at *2 (Fed. Cl. Spec. Mstr. June 2, 2023); *Fisher v. Sec'y of Health & Hum. Servs.*, No. 18-1705V, 2022 WL 2299985, at *4 (Fed. Cl. Spec. Mstr. Apr. 26, 2022); *Riley v. Sec'y of Health & Hum. Servs.*, No. 15-104V, 2021 WL 5177434, at *3 (Fed. Cl. Spec. Mstr. Oct. 13, 2021); *Prescott v. Sec'y of Health & Hum. Servs.*, No. 17-2055V, 2021 WL 1962541, at *2 (Fed. Cl. Spec. Mstr. Apr. 7, 2021); *Nifakos v. Sec'y of Health & Hum. Servs.*, No. 14-236V, 2018 WL 7286553, at *3 (Fed. Cl. Spec. Mstr. Dec. 12, 2018); *Rolshoven v. Sec'y of Health & Hum. Servs*, No. 14-439V, 2018 WL 3986831, at *1 (Fed. Cl. Spec. Mstr. June 26, 2018). Accordingly, I find the requested rates to be reasonable and that no adjustment is warranted.

2. Reasonable Hours Expended

Attorneys' fees are awarded for the "number of hours reasonably expended on the litigation." *Avera*, 515 F.3d at 1348. Ultimately, it is "well within the Special Master's discretion to reduce the hours to a number that, in [her] experience and judgment, [is] reasonable for the work done." *Saxton ex rel. Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1522 (Fed. Cir. 1993). In exercising that discretion, special masters may reduce the number of hours submitted by a percentage of the amount charged. *See Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 728-29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Hum. Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction of attorney and paralegal hours). Petitioner bears the burden of establishing that the rates charged, hours expended, and costs incurred are reasonable. *Wasson v. Sec'y of Health & Hum. Servs.*, 24 Cl. Ct. 482, 484 (1993). However, special masters may reduce awards *sua sponte*, independent of enumerated objections from the respondent. *Sabella v. Sec'y of Health & Hum. Servs.*, 86 Fed. Cl. 201, 208-09 (Fed. Cl. 2009); *Savin v. Sec'y of Health & Hum. Servs.*, 85 Fed. Cl. 313, 318 (Fed. Cl. 2008), *aff'd* No. 99-573V, 2008 WL 2066611 (Fed. Cl. Spec. Mstr. Apr. 22, 2008).

A special master need not engage in a line-by-line analysis of petitioner's fee application when reducing fees. *Broekelschen v. Sec'y of Health & Hum. Servs.*, 102 Fed. Cl. 719, 729 (Fed. Cl. 2011). Special masters may look to their experience and judgment to reduce an award of fees and costs to a level they find reasonable for the work performed. *Saxton v. Sec'y of Health & Hum. Servs.*, 3 F.3d 1517, 1521 (Fed. Cl. 1993). It is within a special master's discretion to instead make a global reduction to the total amount of fees requested. *See Hines v. Sec'y of Health & Hum.*

17

*Servs.*, 22 Cl. Ct. 750, 753 (1991) ("special masters have wide latitude in determining the reasonableness of both attorneys' fees and costs"); *Hocraffer v. Sec'y of Health & Hum. Servs.*, No. 99-533V, 2011 WL 3705153 (Fed. Cl. Spec. Mstr. July 25, 2011), mot. for rev. denied, 2011 WL 6292218, at *13 (Fed. Cl. 2011) (denying review of the special master's decision and endorsing "a global – rather than line-by-line – approach to determine the reasonable number of hours expended in this case").

While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g.*, *McCulloch*, 2015 WL 5634323, at *26.

Petitioner's counsel has provided a breakdown of hours billed and costs incurred. Fees App., Exs. A, B.

    a. Administrative and Clerical Tasks

While attorneys may be compensated for non-attorney-level work, the rate must be comparable to what would be paid for a paralegal or secretary. *See O'Neill v. Sec'y of Health & Hum. Servs.*, No. 08–243V, 2015 WL 2399211, at *9 (Fed. Cl. Spec. Mstr. Apr. 28, 2015). Clerical and secretarial tasks should not be billed at all, regardless of who performs them. *See, e.g.*, *McCulloch*, 2015 WL 5634323, at *26. It is well-established that billing for administrative and clerical tasks is not permitted in the Vaccine Program. *Rochester v. United States*, 18 Cl. Ct. 379, 387 (1989).

Mr. Sadaka's invoice includes dozens of examples of clerical and administrative tasks. The vast majority of these entries describe Ms. Curry's efforts to obtain Petitioner's medical records from various providers, including inquiring about how to submit such requests and following up on requests already submitted. Examples include (but are not limited to):

- December 7, 2018, 0.3 hours: "Communicate with St. Jude Heritage Medical Group re: medical record request."
- May 17, 2019, 0.4 hours: "Communicate with Walgreens Custodian of Records re: following up on medical record request."
- June 4, 2020, 0.3 hours: "Communicate with Vascular and General Surgery Physician Group re: medical record request."

These administrative and clerical tasks total approximately 30 hours, resulting in $4,746.60 in charges. Accordingly, I find that a reduction in requested attorneys' fees of $4,746.60 is warranted.

Total attorneys' fees to be awarded: **$25,509.01**

### B. Attorneys' Costs

Petitioner requests a total of $3,683.27 in attorneys' costs. Specifically, Petitioner requests $1,208.34 for obtaining medical records; $2,000.00 for her expert's retainer fee; $400.00 for the Court's filing fee; and $74.93 for shipping and mailing costs. Fees App. Exs. A, B. Documentation for all medical record requests and the Court's filing fee was provided and these will be paid in full. Petitioner provided documentation for most, but not all, of the mailing and shipping costs incurred. Because these costs are typically required in litigation and because the total is reasonable, this will be paid in full as well.

1. Expert Costs for Marcel Kinsbourne, MD

Petitioner requests a total of $2,000.00 for Dr. Kinsbourne's retainer fee. Fees App. Ex. A at 25. Dr. Kinsbourne did not produce any expert reports in this matter.

Petitioner did not file Dr. Kinsbourne's CV, but he has testified in numerous other cases in the Vaccine Program. Dr. Kinsbourne received his medical training from Oxford University and is board certified in pediatrics. *Heilig v. Sec'y of Health & Hum. Servs.*, No. 16-140V, 2023 WL 2320346, at *6 (Fed. Cl. Spec. Mstr. Mar 2, 2023) (citing Kinsbourne's CV). Dr. Kinsbourne serves on the editorial boards of several journals and has published over 400 peer-reviewed papers. *Id.* I find that Dr. Kinsbourne's retainer fee is reasonable, and it will be paid in full.

Total attorneys' costs to be awarded: **$3,683.27**

## VIII. Conclusion

Accordingly, in the exercise of the discretion afforded to me in determining the propriety of final fee and cost awards, and based on the foregoing, I **GRANT IN PART** Petitioner's application, as follows:

A lump sum in the amount of **$29,192.28**, representing reimbursement of Petitioner's final attorneys' fees and costs in the form of a check jointly payable to Petitioner and her attorney, Mark Sadaka.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the Clerk of Court **SHALL ENTER JUDGMENT** in accordance with this decision.

**IT IS SO ORDERED.**

<u>s/ Katherine E. Oler</u>
Katherine E. Oler
Special Master